# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | |
|---|---|
| LARRY JOHNSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )  No. 4:04CV967-SNL |
| | ) |
| SUSAN ROLLINS, BART SARCINO, | ) |
| JOANNE FREEMAN, MICHAEL | ) |
| QUINN, FRANCIS SLAY in their | ) |
| official capacity as a Member of the | ) |
| Board of Commissioners of the City of | ) |
| St. Louis, JUSTINE GOLDAK, | ) |
| PAMELA LaROSE in their individual | ) |
| capacity as Police Officers of the City of | ) |
| St. Louis, | ) |
| | ) |
| Defendants. | ) |

## **MEMORANDUM OPINION**

Larry Johnson spent more than 17 years in prison for crimes that he did not commit. In 1984 Johnson was convicted by a jury in state court of rape, sodomy, kidnaping, and robbery, and sentenced to life imprisonment. His conviction and sentence were affirmed on direct appeal. State v. Johnson, 722 S.W.2d 62 (Mo. 1986) (en banc). In 2002, DNA testing of biological evidence cleared Johnson of these crimes, and the state trial court ordered his release.

In July 2004 Johnson filed a complaint against the City of St. Louis, the members of the Board of Police Commissioners of the City of St. Louis in their official capacities (Susan Rollins, Bart Sarcino, Joanne Freeman, Michael Quinn, Mayor Francis Slay), Justine Goldak (a civilian police employee) and Pamela LaRose (a police officer), in their individual capacities, and city prosecuting attorney Nels Moss, Jr., in his official capacity. It is alleged in the complaint

(1) a 42 U.S.C. § 1983 claim for malicious prosecution, false arrest, reckless investigation, suppression of exculpatory evidence, and wrongful conviction and imprisonment, in violation of the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, (2) a § 1983 claim for conspiracy, (3) a § 1983 claim against the city and the individual members of the Board for a custom or policy of failing to properly train and supervise police officers, (4) a state law claim for negligence resulting in wrongful incarceration, (5) a state law claim for false arrest, (6) a state law claim for malicious prosecution, and (7) a state law claim for abuse of process. Johnson sought millions of dollars in compensatory and punitive damages, as well as costs, expenses, and attorney's fees, and other relief.

## JURISDICTION

The court has subject matter jurisdiction over this civil rights case under 28 U.S.C. § 1343.

## SUMMARY JUDGMENT STANDARD

Courts have repeatedly recognized that summary judgment is a harsh remedy that should be granted only when the moving party has established the right to judgment with such clarity as not to give rise to controversy. New England Mutual Life Insurance Co. v. Null, 554 F.2d 896, 901 (8th Cir. 1977). Summary judgment motions, however, "can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those that really do raise genuine issues of material fact.' City of Mt. Pleasant v. Associated Electric Coop, Inc., 838 F.2d 268, 273 (8th Cir. 1988).

Pursuant to Fed.R.Civ.P. 56(c), a district court may grant a motion for summary judgment if all of the information before the Court demonstrates that "there is no genuine issue as to

2

material fact and the moving party is entitled to judgment as a matter of law." Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 467 (1962). The burden is on the moving party. Mt. Pleasant, 838 F.2d at 273. After the moving party discharges this burden, the non-moving party must do more than show that there is some doubt as to the facts. Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Instead, the non-moving party bears the burden of setting forth specific facts showing that there is sufficient evidence in its favor to allow a jury to return a verdict for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Celotex Corp. v. Citrate, 477 U.S. 317, 324 (1986).

In passing on a motion for summary judgment, the Court must review the facts in the light most favorable to the party opposing the motion and give that party the benefit of any inferences that logically can be drawn from those facts. Buller v. Buechler, 706 F.2d 844, 846 (8th Cir. 1983). The Court is required to resolve all conflicts of evidence in favor of the non-moving party. Robert Johnson Grain Co. v. Chemical Interchange Co., 541 F.2d 207, 210 (8th Cir. 1976). With this standard in mind, the court now examines the facts of this case.

## **BACKGROUND FACTS**

The following statement of background facts is taken in large part from the state appellate opinion, the complaint and the motion for summary judgment. The sufficiency of the evidence was not challenged on appeal in state court.

At about 12:30 a.m. on January 31, 1984, a man, his face partially covered by the hood of a sweatshirt and a scarf, forced his way into the victim's car. The victim screamed, but then quieted because she realized the man held a knife at her throat and ordered her to "shut up, bitch." The assailant started the car, drove to an alley, parked alongside a garage, and asked the victim into

which trash container she wanted her body put.  He then told the victim to give him her money, and she handed him two dollars from her wallet.  He restarted the car and drove to another alley and parked on an empty lot.  When the victim unlocked her car door, the assailant jabbed at her with the knife and said, "Go ahead and try.  I'd love to kill you."  He then sexually assaulted her in the car.  He told the victim that he had spent "six years either doing time or in the pen or something like that."  There was some light from streetlights and the car's dome light came on at times; the victim observed the assailant's face at close range.  She assured him that she would not go to the police.  He allowed her to leave with her car.  She returned to her apartment, where she reported the crime first to the apartment security guard and then to the police.

The victim gave the following physical description of the assailant to the police:  "Negro, male, age 27-32, 5'5", 160 lbs, medium build, black Afro, clean shaven, pudgy face."  Exhibit A, at 2.  The victim explained that by "clean shaven" she meant no hair on the cheeks or chin.  The victim was taken to a hospital, where samples were collected for a sexual assault kit.  The hospital marked and delivered the sexual assault kit to the police laboratory.

The next day the victim and Goldak used identification overlays of facial features to prepare a composite likeness of the assailant.  Goldak used the "IDMO" (identification by method of operation) kit.  Goldak had been an IDMO operator for about 11 years and had been trained in the process by a qualified instructor.  The IDMO kit uses plastic overlays of facial features to "build" a composite likeness.  The victim did not provide any description of the assailant's hair or ears because the hood of the sweatshirt had covered his head.  However, the victim told Goldak that she believed that he had hair because of the way the hood fit his head.  Goldak selected an "ordinary" haircut in the IDMO kit.  Goldak did not include a beard or mustache in the composite

4

likeness. The victim told Goldak that she thought the composite likeness looked like the assailant "except that the lips bothered" her.

Later that day, the victim identified Johnson as the assailant from a series of photographs shown to her by Goldak. The victim selected Johnson's photograph from about the middle of the photographs; at Goldak's direction, she continued to look through the photographs. She was "fairly certain" of the photograph identification. Although the backs of the photographs included personal information, including prior criminal charges, Goldak did not permit people to see the backs of the photographs when they were looking at them, and the victim did not look at the backs of the photographs.

Later that day, LaRose and other police officers arrested Johnson at his home. At the time of arrest Johnson was 30 years old, 5'6", and weighed 158 pounds. He had a small mustache and a slight beard. Johnson told the police that on the night of the assault he had arrived home at about 10:30 pm, and then watched television with his aunt and his son, and that he had gone to bed about 11:10 pm. Johnson had been a prisoner at Fort Leavenworth from 1975 to 1982. LaRose and Goldak knew that the police had investigated Johnson and that he lived in the area of the assault.

According to Johnson, when he was waiting for the lineup in the sex crimes unit at the police station, he saw what he believed were two hand-drawn sketches of himself. The sketches were not labeled, and he did not see them after the lineup. The sketches were not introduced at trial. The victim had no recollection of a hand-drawn sketch made in her presence and no recollection that anyone had ever shown her a hand-drawn sketch when she made her identification of plaintiff.

5

The victim identified Johnson as her assailant from the lineup. She said that it was hard to be "100 percent sure," but that she was "certain that this is him." The other persons in the lineup were from the jail and included a police officer. LaRose did not select the persons for the lineup. The victim was unable to identify the voice of any of the persons in the lineup. LaRose was with the victim during the lineup. According to LaRose, she did not say anything to the victim about any of the individuals in the lineup, although she did tell the victim that "it was okay to say one way or the other."

Johnson alleges that three of the five men in the lineup had facial hair (contrary to the victim's description; Johnson had a mustache and beard at the time) and that the fourth man was "clearly taller." Johnson also alleges that, after the lineup but before the victim pressed charges at the prosecuting attorney's office, an unidentified police officer told the victim that Johnson lived near the vacant field and that "he had raped other women who had not pressed charges." Johnson argues that this information was false and reassured the victim that her identification was correct.

Moss knew that Johnson had stated that he had been watching television at home at the time and asked his investigator to check Johnson's alibi. According to the investigator, Johnson had gone to bed about 9 pm and his aunt had gone to bed at 11:30 pm.

No identifiable fingerprints were found in the victim's car. The victim stated that the assailant had wiped the inside of the car after the assault. Police laboratory technicians found human sperm and fluids in the car and on clothing found in the back seat of the car but did not conduct any further forensic tests. The laboratory report was provided to defense counsel. The samples from the sexual assault kit also showed human sperm. Neither defense counsel nor the prosecuting attorney requested additional forensic tests (such as blood type, secretor status,

enzymes, saliva).

Before trial, Moss asked Goldak to prepare the same identification composite likeness but to add a mustache. A photograph of this modified composite likeness (that is, the composite likeness with the added mustache) was introduced at trial without defense objection. The victim identified Johnson as the assailant at trial.

As noted above, the state appellate court affirmed Johnson's conviction and sentence. The sole claim on appeal was whether the state trial court abused its discretion in overruling the defense challenge for cause of one venireperson during voir dire, thus forcing the defense to use a peremptory strike. The state appellate court reviewed the voir dire examination and concluded that, although the venireperson had initially expressed reservations about her impartiality and her ability to apply the proper burden of proof, the state trial court did not abuse its discretion in denying the defense challenge for cause. The state appellate court noted the venireperson's unequivocal assurances that she could set aside her personal feelings, would not on account of her feelings believe a witness whom she otherwise would not believe, would keep to the facts, and would follow the law. 722 S.W.2d at 6.

## **DISCUSSION**

Johnson claims that the police failed to adequately investigate the crime and his alibi. He asserts that the police improperly relied on the victim's physical description of the assailant (which he argues did not match his characteristics). He alleges that the police improperly influenced the victim and that, as a result, her identification—initially by photograph and then in the lineup—was unreliable. He also alleges that the police either failed to conduct available forensic tests of the physical evidence or suppressed the exculpatory results and failed to disclose them to defense

7

counsel. In sum, Johnson claims that the police and the prosecuting attorney, acting individually and in concert, intentionally or with reckless indifference to the truth, improperly targeted him as the only suspect for the crime, which resulted in his false arrest, false imprisonment, malicious prosecution, and incarceration, in violation of his constitutional rights.

In support of the motion for summary judgment, defendants argue that the police investigation did not intentionally target Johnson and was not constitutionally inadequate. Defendants argue that the preparation and modification (to add a mustache) of the composite likeness was not material to the victim's misidentification of Johnson because the victim initially identified Johnson as the assailant from his photograph and not from the composite likeness. Defendants also note that the prosecuting attorney requested the modification of the composite image and that neither the police in their investigation nor the victim used the modified composite image in identifying Johnson.

Defendants also argue that the identification procedures were not improper or impermissibly suggestive so as to create a very substantial likelihood of irreparable misidentification under the totality of the circumstances. Defendants also argue that there was no bad faith failure to investigate Johnson's alibi or to conduct additional forensic tests. Defendants also argue that there is no evidence of a conspiracy to deprive Johnson of his constitutional rights. Defendants also argue that there is no evidence of any municipal custom or policy to fail to investigate, make improper identifications or suppress exculpatory evidence and that, under state law, the Board of Police Commissioners is a state agency and thus entitled to 11th amendment sovereign immunity. Defendants also argue that they are protected by qualified immunity, official immunity and several state law defenses.

## BOARD OF POLICE COMMISSIONERS

Johnson brought this action against the city Board of Police Commissioners and each member of the board, in his or her official capacity, for damages arising out of the acts of the city police officers in violation of his constitutional rights. A complaint against a police commissioner in his or her official capacity is construed as a complaint against the board. Thomas v. St. Louis Board of Police Commissioners, 447 F.3d 1082, 1084 n.1 (8th Cir. 2006). A local governmental entity may be subject to liability for constitutional violations of its employees if those violations are caused by official policies or customs. Monell v. New York City Dep't of Social Services, 436 U.S. 658 (1978).

The status of the board as a civil rights defendant has been often litigated. The issue is whether the board is an "arm of the state" for purposes of Eleventh Amendment sovereign immunity. "The sovereign immunity enjoyed by states and recognized in the Eleventh Amendment bars private parties from bringing actions for damages against unconsenting states in federal courts." Thomas v. St. Louis Board of Police Commissioners, 447 F.3d at 1084 (footnote and citations omitted). "While Eleventh Amendment immunity 'extends to states and "arms" of the state,' it does not extend to local governments." Id. (citation omitted). "'[T]he question whether a particular state agency . . . is . . . an arm of the State, and therefore 'one of the United States' within the meaning of the Eleventh Amendment, is a question of federal law." Id. (citation omitted). The issue has renewed controversy because of the recent decision of the Missouri Supreme Court in Smith v. State, 152 S.W.3d 275, 278 (Mo. 2005) (banc), which held that the board is an "agency of the state" for purposes of coverage under the State Legal Expenses Fund. Judgments obtained against the board would be paid from the state treasury.

A federal magistrate judge recently determined that, in light of the Smith decision, under the statutes that create the board (a type of body authorized in Missouri law for only St. Louis and Kansas City), the board was an arm of the state and thus entitled to sovereign immunity. Memorandum and Order (May 10, 2005). However, the Eighth Circuit reversed because it was contrary to direct holdings of the Supreme Court and the Eighth Circuit that rejected the assertion of sovereign immunity and held that the board is not an arm of the state. Thomas v. St. Louis Board of Police Commissioners, 447 F.3d at 1085, citing Auer v. Robbins, 519 U.S. 452, 456 (1997) (holding board was not an arm of the state for purposes of the Fair Labor Standards Act), and Gorman v. Easley, 257 F.3d 738, 743 (8th Cir. 2001) (holding Kansas City board of police commissioners was not an arm of the state in civil rights action), rev'd on other grounds sub nom. Barnes v. Gorman, 536 U.S. 181 (2002).

"[R]ecent developments in Missouri law appear to have eroded the Eleventh Amendment analyses in Auer and Gorman" and "suggest that the St. Louis Board may be an arm of the state entitled to Eleventh Amendment immunity," 447 F.3d at 1085-86 (footnotes omitted). However, "it remains '[the Supreme Court]'s prerogative alone to overrule one of its precedents.' . . . That is so even where subsequent decisions or factual developments may appear to have 'significantly undermined' the rationale for [the Court's] earlier holding." Roper v. Simmons, 543 U.S. 551, 594 (2005) (O'Connor, J., dissenting) (citations omitted). The Eighth Circuit thus held that the board is not an arm of the state and therefore not protected by Eleventh Amendment sovereign immunity. Thomas v. St. Louis Board of Police Commissioners, 447 F.3d at 1086 & n.8. Accordingly, defendant members of the Board of Police Commissioners in this case have no Eleventh Amendment sovereign immunity protection.

## QUALIFIED IMMUNITY

[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity analysis requires two steps. Saucier v. Katz, 533 U.S. 194, 201 (2001). First, the court must determine whether the facts, taken in the light most favorable to the nonmoving party, show the conduct violated a known constitutional right. If there is no violation, the officials are entitled to qualified immunity. If there is a violation, the court must determine whether the right was clearly established at the time that the challenged conduct occurred. "Clearly established" means that the "contours of the right must be sufficiently clear that a reasonable official would understand that what he [or she] is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). Once the predicate facts are established, the reasonableness of the conduct under the circumstances is a question of law. Wilson v. Lawrence County, 260 F.3d 946, 951 (8th Cir. 2001); Lambert v. City of Dumas, 187 F.3d 931, 935 (8th Cir. 1999). "The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" Hunter v. Bryant, 502 U.S. 224, 229 (1991) (per curiam), citing Malley v, Briggs, 475 U.S. 335, 343. 341 (1986).

"Criminal suspects have a constitutional right to be free from identification procedures 'so unnecessarily suggestive and conducive to irreparable mistaken identification' that the identification's use violates due process of law." Gregory v. City of Louisville, 444 F.3d 725, 746 (6th Cir. 2006) (pet'n for cert. filed, July 31, 2006) (U.S. No. 06-171), citing Stovall v. Denno,

388 U.S. 293, 302 (1967). Courts have recognized allegations of suggestive identification procedures as constitutional tort claims. E.g., Gregory v. City of Louisville, 444 F.3d at 746, citing Hutsell v. Sayre, 5 F.3d 996, 1003 (6th Cir. 1993), cert. denied, 510 U.S. 1119 (1994). However, it is only unduly suggestive identification procedures that violate the core right to a fair trial that are actionable under § 1983. Pace v. City of Des Moines, 201 F.3d 1050, 1055 (8th Cir. 2000), citing Hensley v. Carey, 818 F.2d 646, 648-49 (7th Cir.), cert. denied, 484 U.S. 965 (1987). "The jurisprudential doctrine described in Manson v. Brathwaite, 432 U.S. 98, 113 n.13 (1977), against the admission of unduly suggestive lineups is only a procedural safeguard, and does not establish a constitutional right to be free of suggestive lineups." Pace v. City of Des Moines, 201 F.3d at 1055, citing Hensley v. Carey, 818 F.2d at 648 (holding Manson and Stovall protect only against admission of unreliable evidence at trial and do not establish a constitutional right to be free of suggestive lineups, at least in the absence of coercion or other misconduct).

Here, Johnson claims that the manner in which the defendants investigated his involvement in the assault, which culminated in his prosecution, conviction and incarceration, violated clearly established constitutional rights of which a reasonable officer would have known. Johnson challenges the pre-trial identification procedures. Johnson attacks the victim's viewing of police photographs, the discrepancy between the victim's description of her assailant and his appearance, the creation and modification of the composite identification, and the lineup. Johnson also claims that the defendants failed to adequately investigate his alibi or obtain a search warrant for his residence and failed to conduct available forensic tests of the biological evidence, the results of which he argues would have exonerated him. In short, he argues that he would not have been misidentified and then prosecuted (and convicted and incarcerated) had the defendants conducted

the investigation in a way, which did not violate his constitutional rights.

To the extent that Johnson's claim involves the evidentiary use of the victim's identification, he fails to state a 42 U.S.C. § 1983 claim because he has no constitutional right to be free of unduly suggestive identification procedures. He has a constitutional right to a fair trial and the right not to have a tainted identification admitted into evidence; and the remedy for that violation is evidentiary, that is, suppression of the tainted identification in the trial. E.g., United States v. Donelson, 450 F.3d 768, 772-73 (8th Cir. 2006) (pre-trial identification may implicate a defendant's due process rights; direct appeal of criminal conviction following jury trial). A similar claim was rejected in Pace v. City of Des Moines, 201 F.3d at 1055. In that case, the police improperly photographed Pace's tattoo and showed the victim two of these photographs. The victim identified Pace as her assailant from the photographs. Pace challenged this identification procedure as impermissibly suggestive. The court of appeals held that there is no constitutional right to be free of suggestive lineups. Id. (holding defendant police officer was entitled to qualified immunity).

Were the Court to evaluate the pre-trial identification procedures, the Court would not find them unduly suggestive. The victim was able to provide the police with a general description of the assailant and his clothing. The victim was able to work with Goldak to produce a composite likeness of her assailant. The victim viewed many police photographs before picking out Johnson's photograph. Johnson does not argue that it was improper to include his photograph among the other photographs viewed by the victim.

The lineup contained five individuals of roughly similar physical characteristics and who

wore comparable clothing. (The record includes a color photograph of the lineup.) "The police authorities are required to make every effort reasonable under the circumstances to conduct a fair and balanced presentation of alternative possibilities for identification . . . . What is required is the attempt to conduct a fair lineup, taking all steps reasonable under the 'totality of the circumstances' to secure such result." Wright v. State, 46 Wis. 2d 75, 86, 175 N.W.2d 646, 652 (1970) (cited in Hensley v. Carey, 818 F.2d at 650). Here, the victim had the opportunity to observe the assailant at the time of the crime and demonstrated a relatively high level of certainty in her identification of the composite likeness, the photograph and the lineup; the length of time between the crime and the identification procedures was relatively short. Cf. Pace v. City of Des Moines, 201 F.3d at 1057 (holding victim's identification was sufficiently credible to allow a reasonable officer to believe that probable cause existed to detain and arrest), citing Brodnicki v. City of Omaha, 75 F.3d 1261, 1265 (8th Cir.) (reviewing factors to be considered in assessing reliability of identification), cert. denied, 519 U.S. 867 (1996).

Johnson also claims that the defendants failed to adequately investigate his alibi and failed to conduct available forensic tests of the biological evidence, the results of which he argues would have exonerated him. Reckless or intentional failure to investigate would violate a defendant's due process rights; however, even gross negligence would not rise to the level of a constitutional violation. E.g., Wilson v. Lawrence County, 260 F.3d at 955 (citing cases involving allegations of failure to investigate other leads or suspects); cf. Villasana v. Wilhoit, 368 F.3d 976, 978-81 (8th Cir. 2004) (holding crime laboratory officials did not have clearly established obligation under Brady to disclose exculpatory or potentially exculpatory evidence to the prosecution or plaintiff); Criss v. City of Kent, 867 F.2d 259, 263 (6th Cir. 1988) (police officer is "under no obligation to

give any credence to a suspect's story nor should a plausible explanation in any sense require the officer to forego arrest pending further investigation if the facts as initially discovered provide probable cause"), cert. denied, 543 U.S. 1153 (2005), citing Baker v. McCollan, 443 U.S. 137, 145 (1979) ("The Constitution does not guarantee that only the guilty will be arrested.").

Here, Johnson told LaRose that he had been home at the time of the incident and did not know anything about it. LaRose recalled that Johnson stated that his aunt had been at home earlier on the night of the incident, but that the aunt had not seen Johnson for several hours that night. The prosecuting attorney's investigator pursued the alibi and learned that Johnson had gone to bed at 9:00 pm and the aunt had gone to bed at 11:30 pm. The aunt could not provide an alibi for Johnson after midnight (the time of the incident). There is no evidence of other suspects. Cf. Wilson v. Lawrence County, 260 F.3d at 955-56 (noting reckless or intentional failure to investigate other leads plus coerced confession and no corroborating evidence). The victim was able to describe the assailant, identified his photograph and selected him in a lineup. Other evidence was consistent with Johnson being the suspect—he lived in the area, he did not have an alibi, and he had spent 6 years in prison (which is what the assailant told the victim). Thus, there is no evidence of reckless or intentional failure to investigate which rises to the level of a constitutional violation.

Johnson also argues that the police should have conducted additional forensic tests on the biological evidence and that the results would have exculpated him. Additional tests were not conducted. However, "the police do not have a constitutional duty to perform any particular tests." Arizona v. Youngblood, 488 U.S. 51, 59 (1988); cf. Villasana v. Wilhoit, 368 F.3d at 979 (DNA testing). These events occurred in early 1984. There is no evidence that the police

recklessly or intentionally failed to conduct additional forensic tests or acted in bad faith.

Johnson also claims that Goldak, LaRose and Moss conspired to deprive him of his due process right to a fair trial by using suggestive identification procedures and failing to investigate his alibi defense and to conduct additional forensic tests. He also claims that the city had a custom or policy of failure to adequately train or supervise its police officers and employees in the use of identification procedures, exculpatory evidence, destruction of evidence, or investigation. However, there is no evidence of conspiracy or that the police officers or city employees acted unreasonably under the circumstances in violation of a clearly established constitutional right or that there was a city custom or policy of failure to adequately train or supervise police officers or employees. See, e.g., Russell v. Hennepin County, 420 F.3d 841, 846 (8th Cir. 2005) (citing cases that hold municipal liability requires unconstitutional act by municipal employee); Ricciuti v. N.Y.C. Transit Authority, 124 F.3d 123, 132 (2d Cir. 1997) (claim of inadequate training and supervision cannot be made out against a supervisory body absent finding of constitutional violation by the persons supervised).

In any event, Moss is entitled to absolute immunity for prosecutorial functions. This includes "professional evaluation of the evidence assembled by the police and appropriate presentation for its presentation at trial." Buckley v. Fitzsimmons, 509 U.S. 259, 273 (1993).

Because defendants are entitled to qualified immunity, the Court grants defendants' motion for summary judgment and the federal claims are dismissed. The Court declines to exercise supplemental jurisdiction over the state law claims and expresses no opinion on the merits of defendants' state law claims or defenses.

Dated this 31st day of August, 2006.

_____
SENIOR UNITED STATES DISTRICT JUDGE